IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| DEVELOPERS SURETY AND INDEMNITY COMPANY, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. 11-0645-CV-W-NKL ) ) |
| POPULOUS, INC. *et al.*, | ) ) |
| Defendants. | ) ) |

**ORDER**

Pending before the Court is a Motion to Dismiss [Doc. # 154] and Motion for Summary Judgment [Doc. # 156] filed by Defendants Kansas City Chiefs Football Club ["the Chiefs"] and Jackson County Sports Complex Authority ["the Sports Authority"] [collectively "the Chiefs"], as well as a Motion for Summary Judgment [Doc. # 155] filed by Defendant Jackson County, Missouri; and Motions for Summary Judgment filed by Populous Inc. [Doc. # 164]; The Konrath Group [Doc. # 162]; and Ghostfire Design, Inc. [Doc. # 166].

**I. Background**

Developers is a surety who brought a lawsuit against several defendants involved in renovations to Arrowhead Stadium, including the construction of the Chiefs Hall of Honor and Children's Learning Center at Arrowhead Stadium. The Kansas City Chiefs

1

entered into a written contract with Defendant Ghostfire Design to serve as contractor for the project.  Ghostfire's contract with the Chiefs obligated it to submit periodic invoices including:

> [An] updated schedule and progress report setting forth in detail the actual progress to date (in terms of percent complete) and the scheduled or planned progress, a listing of the value of material on hand included in the Invoice, and other data specified in the Contract Document....

[Doc. # 1 at 6].  Ghostfire would then be entitled to be paid according to the payment schedule, but only "so long as [Ghostfire] has progressed with the [work] as required." [*Id* at 8].

Ghostfire then entered into a written subcontract with L&L Group, in which L&L agreed to provide fabrication and services for all exhibit casework.  The contract between L&L and Ghostfire incorporated by reference Ghostfire's contract with the Chiefs and further states that "[a]ll payment applications and progress of the work will be directed, approved, and processed by Design Consultant [Ghostfire] ...."  [Doc. # 1-3].  Section 16.0 of the L&L Agreement with Ghostfire provides that L&L was to be paid a total of $639,100.00, for the scope of work it was to perform.  [Doc. # 1-3 at 6, sec. 16.0) [Doc. # 161 at 10].  The Agreement states that payment should be made "in one deposit payment, and four progress payments upon receipt of invoices for services performed and expenses incurred."  [Doc. # 1, ¶ 36].

The Chiefs also entered into a written contract with Defendant Populous, who agreed to serve as architect for the project.  Populous' contract with the Chiefs stated that it would provide "Application for Payment certification services" to the Chiefs.  This

2

Case 4:11-cv-00645-NKL   Document 220   Filed 10/11/12   Page 2 of 17

work involved reviewing and inspecting the work of contractors on the project, including Ghostfire and L&L, and then certifying that:

> [T]he Contractors' applications for payment are accurate and correct, that they accurately represent the quantity of Work in place or reasonably stored at the site, that the Work complies with the requirements of the Contract Documents, and that the application accurately reflects previous payments and retainage amounts.

[Doc. # 107 at 6].

Defendant Konrath contracted with the Chiefs to serve as program manager for the project. Their contract with the Chiefs involved oversight of the architect and other design professionals' work.[1]

L&L submitted 5 pay applications in July 2009, September 2009, November 2009, February 2010, and March 2010. The first four of these pay applications were paid by the Chiefs, but the last one submitted on March 31, 2010, was not. Pay Applications 1, 3,

---

[1] During all Phases of the Project, monitoring and reviewing Architect's and Construction Manager's performance and compliance with their respective contracts and recommending to the Chiefs appropriate actions to meet the Project's cost, schedule and quality goals. During all Phases of the Project, performing general monthly reviews of all invoices from the Architect and Construction Manager to confirm compliance with their respective contracts and recommending approval or rejection of such invoices....
. . .

During all Phases of the Project and as set forth below, provide Quality Management Services consisting of....[o]verseeing the Architect and Construction Manager in reviewing work and providing recommendations concerning rejection of non-conforming Work, monitoring status of remedial corrective Work, and monitoring Master Schedule for any remedial necessary Work.

[Complaint, Doc. # 1 at 15].

3

and 4 were certified by Populous before being paid by the Chiefs, while the second pay application was not provided to Populous before payment.

On May 3, 2010, L&L closed its business operations and had no further funds to finish the project to its completion. Ghostfire declared L&L in default and made demand on Plaintiff, Developers Surety to correct the breach. In 2009, Developers had issued a performance bond to the Chiefs under which Developers guaranteed the performance of L&L on the project. Under the bond, Developers had the obligation upon notice of "contractor's failure to perform," to

> promptly and at Surety's expense take one of the following actions: (a) Arrange for Contractor, with the written consent of the Owner, to perform, complete or cure the default or breach of the Contract; (b) Undertake to perform and complete the Contract itself through qualified Contractors approved by Owner; or (c) Waive its right to perform, complete or cure the default or breach of the Contract and pay to the Owner the total amount due Owner from Contractor under the terms of the Contract not to exceed the amount of this Bond as set forth in Paragraph 11.

[Doc. # 161, ¶ 96].

After the default, Developers retained the services of Guardian Group, Inc., to investigate the claim made against the performance bond by the Chiefs and provide recommendations to Developers on a course of action. Developers chose to waive it's right to perform under the bond and instead to pay a penal sum. The penal sum listed in the contract was $639,100.00, with a reservation of rights. But Developers initially paid the sum of $618,325.56, citing $20,674.44 that Developers claims it incurred to move, store and ship materials from L&L's facility in Indiana to the completion contractor, EAI. [Doc. # 161 at ¶ 158].

4

Defendants claim that the Court penal sum comprises the original amount of $639,100.00, plus the amounts of two agreed change orders altering the L&L scope of one in the amount of $14,700.00, and one in the amount of $8,250.00. Thus, Defendants claim that the correct total penal bond sum was $662,050.00. Under Paragraph 8 of the Performance Bond, Developers waived "notice of any change, including changes of times, to the Contract or to related subcontracts, purchase orders and other obligations, provided that the Surety will be notified in writing by Owner of any change that would cause the aggregate amount of all changes to exceed twenty percent (20%) of the original Contract Sum. [Doc. # 161, ¶ 97]. Developers disputes Defendants' assertions that L&L executed these change orders and initially did not pay this increased amount. In 2012, as this litigation was ongoing, however, Developers paid Chiefs the additional sum of $22,950.00, while claiming a full reservation of rights.

According to Developers, the Chiefs significantly overpaid L&L when compared to the amount of work L&L had completed on the project. Further, Populous, Ghostfire and Konrath failed to properly supervise payments to L&L as required by their contracts with the Chiefs and the standards of their professions.

Developers' damages analysis appears to be based on the costs it would have incurred to complete the project had the overpayments not been made. It is undisputed that more probably than not, Developers would have elected to pay the penal sum of the performance bond to the Chiefs as long as the cost to Developers to complete L&L's scope of work exceeded 75% of that sum, due to the risk of the ultimate completion cost

5

being more than L&L's contract and other factors. As of the date of L&L's default, the amount left in the Chiefs' contract balance that Plaintiff could use to complete L&L's scope of work was approximately $124,000.00. While there is a dispute of fact concerning the value of L&L's completed work, viewing the facts in the light most favorable to the non-movant Developers, the Court assumes that L&L was overpaid by at least $364,503.00, based on pay applications that were submitted by Ghostfire, certified by Populous and approved by Konrath. Developers has explained its damages calculation as follows:

> To determine its damages, Developers must calculate what its liability under the Bond would have been: (1) if the overpayments had not been made, and (2) if the Chief's had not delayed making its material selections until 10 days before all of the cabinet work and display units were supposed to be complete and available for inspection. Calculating the amount of the overpayments is straight forward: $639,100 (original contract amount) less $124,597.00 (remaining contract balance) less $150,000 (the value of L&L's work) equals $364,503.

Included in Developers' damages analysis is a premium alleged to have been paid to the completion contractor EAI in order to complete L&L's work. On or about May 27, 2010, replacement contractor EAI submitted a completion bid in the amount of $984,525.62 to Guardian Group to complete L&L's scope of work on the project, more than $300,000.00 higher than the original amount of L&L's contract with the Chiefs. EAI's bid was the lowest bid made to complete L&L's scope of work. [Doc. # 176 at 24]. Plaintiff's expert Hutchison testified that there was a premium paid to EAI of $347,760.00, because of the compressed schedule required for the completion contractor to complete the project, as well as greater labor costs in hiring EAI. [See Affidavit of

6

William B. Hutchison, Doc. # 174-5 at 5]. L&L had fifteen months to complete its contract and L&L was a non-union shop. EAI had ten weeks (only 2 ½ months) to complete the L&L contract work and EAI was a union labor shop. Additionally, the L&L contract was a lump sum contract to be paid regardless of its total labor costs while EAI's labor cost is paid on an hourly rate until it reached the maximum amount of its contract. Defendants dispute the existence of this premium, but the Court assumes it to be correct for purposes of summary judgment.

## II. The Lawsuit

Developers filed suit against six defendants: the Chiefs, the Jackson County Sports Authority; Jackson County, Missouri; Populous; Konrath; and Ghostfire.

### A. The Chiefs, the Sports Authority and the County

Developers filed two counts against the Chiefs, the Authority, and the County: one for breach of contract of a provision of the performance bond dealing with the Chiefs payments to L&L and one for declaratory judgment.

Count III of Developers' complaint pleads that "[t]he Chiefs, the Authority and the County (collectively "Obligees") failed to fulfill their obligations to Plaintiff under the Performance Bond and have breached said contract." [Doc. # 1 at 101]. The primary breach alleged was an overpayment by the Obligees to L&L for work actually performed. [*Id*. at 102].

The Performance Bond and Additional Obligee Rider ("the Rider") state that:

> [Developers] shall not be liable under the Bond to the
> Primary Obligee, the Additional Obligees, or any of them,

7

> unless the Primary Obligee, the Additional Obligees, or any
> of them, as applicable, shall make payments to [L&L] . . .
> strictly in accordance with the terms of said Contract as to
> payments and shall perform all other obligations to be
> performed under said Contract at the time and in the manner
> therein set forth.

[Doc. # 1, 105-06].

The Chiefs were sued as the Primary Obligee while the Authority and the County were sued as "Additional Obligees" under the Rider. These claims have now settled. Consequently, the motion to dismiss and the motions for summary judgment filed by the Chiefs, the Authority, and the County, [Docs. ## 154, 155, 156], are DENIED as moot.

The remaining claims are against Konrath, Populous and Ghostfire. Developers sues these three defendants for breach of contract, as well as negligence, alleging that they failed to "properly monitor, supervise, confirm, approve and/or certify the pay applications submitted by L&L" because the "actual percentage of completion of work on the project was well below the amounts submitted by L&L for repayment." [Doc. # 1 at 22]. Even though Developers did not contract directly with these parties, it asserts the right to bring a claim against them under the principle of equitable subrogation; in other words, as surety for the project, it seeks to stand in the shoes of the Chiefs to sue Populous, TKG and Ghostfire.

## III. Discussion

### A. Summary Judgment Standard

A moving party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

8

matter of law." FED. R. CIV. P. 56(a). The party moving for summary judgment bears the burden of showing that there is no genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). When considering a motion for summary judgment, a court must scrutinize the evidence in the light most favorable to the nonmoving party and the nonmoving party "must be given the benefit of all reasonable inferences." *Mirax Chem. Prods. Corp. v. First Interstate Commercial Corp.*, 950 F.2d 566, 569 (8th Cir.1991) (citation omitted).

### B. Subrogation

Even though Developers did not contract directly with Konrath, Populous and Ghostfire (hereafter collectively "Defendants"), it asserts the right to bring a claim against them under the principle of equitable subrogation. In other words, it seeks to stand in the shoes of the Chiefs to sue Populous, TKG, and Ghostfire for actions which allegedly damaged the Chiefs and indirectly Developers. Subrogation is an equitable principle that seeks to reimburse a party that pays the debt of another. *New York Title & Mortgage Co. v. First. Nat. Bank*, 51 F.2d 485, 487 (8th Cir. 1931). The right of equitable subrogation only arises "upon total satisfaction of the underlying obligation." RESTATEMENT (THIRD) OF SURETYSHIP & GUARANTY § 27 (1996); *Pennsylvania Nat'l Mut. Cas. Ins. Co. v. City of Pine Bluff*, 354 F.3d 945, 951 (8th Cir. 2004).

The difficult question presented in this case is whether a surety can subrogate to the claims of the obligee where the surety voluntarily pays a penal bond in lieu of

9

completing performance of the primary obligor's underlying obligation. Developers contends that it is subrogated to the claims of the Chiefs because it fully performed under the surety contract by paying the bond. Upon payment of the bond, Developers claims, it was fully discharged under the bond and thereby entitled to subrogate to the rights of the Chiefs. Defendants respond that Developers cannot subrogate because it knew about the overpayments when it paid the bond and yet did not withhold the allegedly discharged portion of the bond. As a result, Defendants urge, any amount paid in excess of the amount owed was a voluntary payment and the voluntary payment doctrine bars subrogation. Developers replies that the voluntary payment doctrine, if it applies at all, would only apply to its claims against the Chiefs; it does not affect Developers' subrogated claims against third-parties.

It is the general rule in this state, as elsewhere, that a voluntary payment cannot be recovered. A voluntary payment is a payment made, which the payor does not owe and which is not enforceable against him, instead of invoking the remedy or defense which the law affords against the demand for payment. The voluntary payment doctrine only bars recovery in the absence of compulsion or fraud, mistake of fact, and an agreement between the parties at the time of payment that any excess will be repaid. There is substantial case law in Missouri and elsewhere concerning the extinguishment of a party's right to sue to recover funds wrongfully paid if the funds were paid voluntarily and with full knowledge of the breach. In *Huch v. Charter Communications, Inc.*, 290 S.W.3d 721 (Mo. banc 2009), the Missouri Supreme Court said:

> The voluntary payment doctrine "is well established, both in England and in this country, [and the doctrine provides] that a person who voluntarily pays money with full knowledge of all the facts in the case, and in the absence of fraud and duress, cannot recover it back, though the payment is made without a sufficient consideration, and under protest." . . . Unless there is fraud or duress, the voluntary payment doctrine prohibits a person who voluntarily pays money with full knowledge of the facts from recovering the money. When evaluating the rationale behind this rule of law, courts emphasize that "[a] person who, induced thereto solely by a mistake of law, has conferred a benefit upon another to satisfy in whole or in part an honest claim of the other to the performance given, is not entitled to restitution." "The underlying reason for those requirements is that it would be inequitable to give such person the privilege of selecting his own time and convenience for litigation short of the bar of the statute of limitations, and thereby subject the payee to the uncertainties and casualties of human affairs likely to affect his means of defending the claim."

*Huch*, 290 S.W.3d at 726 (internal citations omitted). Developers has presented no case law or argument that would exempt compensated sureties from the application of this doctrine. Further, there is law from across jurisdictions ruling that a surety cannot bring an affirmative claim to discharge liability after the funds have been paid. *See, e.g.*, *McLean v. Love*, 157 So. 361, 362 (Miss. 1934). Similarly, regarding subrogation specifically, "a surety who performs work or pays a debt that it was not actually obligated to perform or pay acts as a volunteer and cannot claim rights of subrogation." *Liberty Mut. Ins. Co. v. N. Picco & Sons Contracting Co.*, No. 05 Civ. 217(SCR), 2008 WL 190310, at *7 (S.D.N.Y. Jan. 16, 2008).

Developers' payment of the penal bond fits squarely within the definition of a voluntary payment. Upon L&L's default, Developers had a choice between completing the contract itself and paying the bond up to a stated amount. Developers chose the latter. Developers suggests that this was not voluntary because full performance was not

11

financially feasible given the circumstances. But an informed choice is not rendered involuntary simply because it reflects a calculated decision to avoid a more difficult or injurious outcome. *Cf. Brady v. United States*, 397 U.S. 742, 749-755 (finding a plea "voluntary" where motivated by the desire to avoid the possibility of a harsher sentence after trial).

In addition, Developers voluntarily paid more on the bond than it believed it owed. It is undisputed that Developers was aware of the overpayments made to L&L at the time it paid under the bond. According to Developers, these overpayments discharged a portion of its liability on the bond. Nonetheless, Developers made no attempt to withhold the amount allegedly discharged by the overpayments, though Developers acknowledges that it had that right. In fact, Developers did withhold some payments when it tendered the penal bond due to the contested change orders and certain transportation costs it incurred. Clearly, then, Developers was aware of its right to withhold the portion of the bond it claims was discharged by the overpayments. But instead, Developers paid an amount under the bond it considered to be in excess of the amount it actually owed.

This is the very definition of a voluntary payment. If this payment were not voluntary, a surety, with full knowledge of all the relevant facts, could pay the obligee more than what is owed on a bond and then later file suit, whenever it is most convenient for the surety, to recover a portion of the amount paid. This is the precise result the voluntary payment doctrine exists to prevent. *See Huch*, 290 S.W.3d at 726 ("The underlying reason for [the voluntary payment doctrine] is that it would be inequitable to

12

give [the payor] the privilege of selecting his own time and convenience for litigation short of the bar of the statute of limitations, and thereby subject the payee to the uncertainties and casualties of human affairs likely to affect his means of defending the claim.").

Furthermore, Developers' position that payment of the bond was not voluntary is fundamentally inconsistent. Developers asserts that its payment under the bond contract was not voluntary because this payment was contractually obligated. At the same time, Developers argues that it paid in excess of what was required under the contract because a portion of its liability on the bond was discharged by the overpayments made to L&L. It is difficult to see how a payment could be simultaneously required and in excess of what was required under a contract. Moreover, Developers did not have to pay the penal bond because it also had the option to fully perform the underlying contract. Thus, there is little doubt that Developers volunteered any payment it made in excess of what it claims to have owed on the penal bond.

But this does not resolve the question of whether voluntary payment of the bond in lieu of performance precludes Developers from subrogating to the causes of actions available to the Chiefs. This is a novel issue and there appears to be little if any case law that presents analogous facts or provides meaningful guidance for resolving these claims. The only case presented that is nearly on point is *Liberty Mutual Insurance Co. v. N. Picco & Sons Contracting Co.*, No. 05 Civ. 217(SCR), 2008 WL 190310, (S.D.N.Y. Jan. 16, 2008). In that case, the court rejected the defendants' argument that the volunteer

13

doctrine barred the surety's claim to subrogation. *Id*. at *9. But *Liberty* is distinguishable from the present case.

In *Liberty*, the surety issued a performance bond guaranteeing a contractor's construction of a school. *Id*. at *1. After the contractor defaulted, the surety undertook to fully complete the construction. *Id*. During completion of the school, the surety incurred excess costs due to the unforeseen need to remediate water damage. *Id*. at *2. Because water damage remediation was not part of the contractual obligations of the original contractor, the defendants argued that the surety "volunteered" to complete this extra work and therefore couldn't recover the additional costs. *Id*. at *8.

The court rejected this defense because it found that applying the voluntary payment doctrine in these circumstances would "ensnare [the surety] in a fiendish Catch 22." *Id*.

> If [the surety] had not remediated the water damage, their work would have been useless. [The surety] would have finished the school in such a way as to make it unsafe and uninhabitable. Defendant . . . would have then argued that [the surety] should not be paid for such senseless work. The alternative, as Defendants argue here, is that [the surety] would remediate the water damage and then be precluded from seeking compensation as a "volunteer."

*Id*. Noting that the surety acted to protect all of the parties' interests by performing the remediation, the court found the above result unfair from a policy perspective and declined to apply the voluntary payment doctrine. *Id*.

In this case, Developers did not act to protect every parties' interest but rather to protect its own. Developers chose to pay the performance bond in lieu of assuming

14

liability for full performance of the underlying contract. It is undisputed that Developers had this right under the bond contract. But the question before the Court is how this impacts the equities in this case. *Cf. American Sur. Co. of New York v. Washington Elec. Mfg. Co.*, 296 U.S. 133, 137 (1935) (noting that, where the surety relieved itself from liability upon payment of a penalty bond, "[l]iability to pay was ended, but equities growing out of the suretyship relation survived in undiminished force.").

As indicated above, the voluntary payment doctrine, like equitable subrogation, is fundamentally rooted in equitable principles and thus must adapt to the unique circumstances of the particular case. For instance, the *Huch* court clarified that the voluntary payment doctrine was not applicable in all situations, and found, in the circumstances presented in that case, that customers who voluntarily made payments to a cable company for an unordered channel could still seek recovery for the payments because the cable company's actions had violated Missouri's merchandising practices act. *Huch*, 290 S.W.3d at 727. The court found that the legislative purpose of the act precluded the availability of the voluntary payment doctrine as a defense. *Id.*

In this case, equitable and policy considerations support application of the voluntary payment doctrine to bar Developers' claim to subrogation. Despite the alleged overpayment, the actual completion of the underlying contract cost the Chiefs considerably more than the amount Developers paid under the bond. Even though Developers paid substantially less than the cost of actual completion, Developers nonetheless seeks to subrogate in full to the rights of the Chiefs.

15

Because the Chiefs bore the cost of completion in excess of the amount Developers paid under the bond, it would be inequitable to permit Developers to subsume the Chiefs' causes of action against these Defendants. As the Supreme Court noted in *American Surety*:

> A surety who has undertaken to pay the creditors of the principal, though not beyond a stated limit, may not share in the assets of the principal by reason of such payment until the debts thus partially protected have been satisfied in full. . . . A surety liable only for part of the debt does not become subrogated to collateral or to remedies available to the creditor [i.e., the obligees] unless he pays the whole debt or it is otherwise satisfied.

*American Sur. Co. of New York*, 296 U.S. at 137 (quotation omitted). The Restatement of Suretyship provides further support for this conclusion.

> The obligee would be disadvantaged, however, if the secondary obligor were subrogated to rights of the obligee before complete satisfaction of the underlying obligation. In such a case, *the rights obtained by the secondary obligor through subrogation would compete with the remaining rights of the obligee* pursuant to the underlying obligation, with the result that the remaining recovery of the obligee on account of the underlying obligation could be diminished. Moreover, *because both the secondary obligor and the obligee would be asserting rights arising from the same undivided claim, conflicting enforcement efforts could easily result*. Thus, the secondary obligor is not entitled to subrogation to the rights of the obligee until the underlying obligation is completely discharged.

RESTATEMENT (THIRD) OF SURETYSHIP & GUARANTY § 27 (1996) (emphasis added). Developers argues that the underlying obligation was completely discharged when it paid the bond. But Developers cannot cite any case where a surety was permitted to subrogate to the claims of the obligee in circumstances comparable to those of the present case. To permit subrogation in these circumstances is to permit a surety to voluntarily pay a stated amount that is insufficient to cover the principal's breach, thereby

16

absolving itself of liability to the obligee, and then turn around and claim a right to recover the bond payment via the very claims the obligee may need to bring in order to recover the costs incurred to complete the project. Equity will not permit this result.

Consequently, in the present case, the voluntary payment doctrine prohibits Developers from subrogating to the claims of the Chiefs against the Defendants. Based on the undisputed facts, Developers' claim to subrogation is thus barred as a matter of law. Because all of Developers' claims against Defendants Populous, Konrath, and Ghostfire rest on its asserted right to subrogate to the claims of the Chiefs, Defendants are entitled to summary judgment.

## III. Conclusion

For the foregoing reasons, the Motions for Summary Judgment filed by Populous Inc. [Doc. # 164]; The Konrath Group [Doc. # 162]; and Ghostfire Design, Inc. [Doc. # 166], are GRANTED.

s/ Nanette K. Laughrey  
NANETTE K. LAUGHREY  
United States District Judge

Dated: October 11, 2012
Jefferson City, Missouri